NOT DESIGNATED FOR PUBLICATION

No. 119,673

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MAUREEN E. MULALLY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; AARON T. ROBERTS, judge. Opinion filed July 17, 2020.
Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Daniel G. Obermeier* and *David Greenwald*, assistant district attorneys, *Mark A. Dupree Sr.*,
district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BUSER, P.J., SCHROEDER and WARNER, JJ.

BUSER, J.: Maureen E. Mulally appeals her conviction of aggravated battery while
driving under the influence of drugs in violation of K.S.A. 2016 Supp. 21-5413(b)(3)(A).
Mulally raises several issues challenging the sufficiency of the evidence supporting her
conviction, the admissibility of evidence, and jury instructions. Upon our review of the
appellate briefs, the record on appeal, and oral arguments, we find no error and, as a
result, affirm the conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of February 1, 2017, Carla Smith was driving home from work on a two-lane street when she noticed an oncoming Jeep Cherokee traveling in her lane and moving towards her. The driver of the Jeep seemed to be looking down, because Smith could only see the top of her head and not her face. The Jeep appeared to accelerate as it approached Smith. Smith waited for the driver to raise her head and see that she was in Smith's lane, but the driver did not look up. As a result, Smith took her foot off the accelerator and braced herself for the impending collision.

At 4:31 p.m., after the Jeep struck Smith's vehicle, Officer Brian Lynn was dispatched to the scene. Upon arrival, Officer Lynn observed the very violent collision. The vehicles were totaled. Officer Lynn identified Mulally as the driver and only occupant of the Jeep. After Mulally and Smith were extricated from their vehicles, they were transported to Overland Park Regional Hospital for treatment.

As part of Officer Lynn's investigation, he went to the hospital to speak with Mulally and Smith. When he arrived, an emergency room nurse, Hallie Thompson, handed him a small clear plastic baggie that was found in Mulally's bra. Officer Lynn recognized the baggie as a type commonly used to contain illegal narcotics. The officer observed some type of residue in the baggie but it was not tested for the presence of drugs. At trial, Officer Lynn explained there was not enough residue to perform such a test.

Officer Lynn spoke with Mulally at the hospital. Mulally told Officer Lynn that at the time of the collision she was driving to Lawrence and a man named Darren was in the vehicle. Officer Lynn believed this statement was nonsensical because at the time of the collision, Mulally was traveling east and Lawrence was west of her location. Additionally, Officer Lynn informed her that nobody else was found in the Jeep.

Officer Lynn wanted to obtain a blood sample from Mulally due to the baggie found on her. She initially agreed to the procedure but after the officer read an implied consent advisory to Mulally, she refused to consent to the blood draw. Officer Lynn arrested Mulally for possession of drug paraphernalia and traffic violations. She was then released to the care of the hospital.

While in the emergency room, Thompson administered the opiate, Dilaudid, to Mulally on three occasions between 5:18 p.m. and 6:25 p.m. Hospital records showed that after Thompson left the hospital at 7 p.m., a dose of Dilaudid and Ativan—benzodiazepines—were administered to Mulally at 7:23 p.m. and 7:36 p.m. At a physician's direction, hospital staff performed a urine drug screen on Mulally. The urine specimen was collected at 9:10 p.m. and it revealed that Mulally tested positive for opiates, benzodiazepines, and amphetamines.

Detective James Gunzenhauser, an accident reconstruction specialist, investigated the collision. The detective obtained a search warrant for Mulally's medical records regarding her treatment at the hospital. Upon executing the search warrant, Detective Gunzenhauser received Mulally's drug screen results.

A week after the collision, on February 8, 2017, Detective Gunzenhauser went to the hospital and interviewed Mulally. The conversation was recorded. Before interviewing Mulally, Detective Gunzenhauser did not advise her of *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The detective made sure that Mulally was able to talk intelligently with him. He told Mulally that she could stop talking at any time and he was not going to take her to jail no matter what was discussed.

During Detective Gunzenhauser's interview, Mulally stated that she would cooperate to the best of her ability, unless the matter would incriminate her because she

knew enough about the law to realize "when to shut up." Mulally explained that she did not remember anything regarding the accident, but she was driving to pick up her friend, Darren Curtis, from his worksite. Mulally denied drinking alcoholic beverages on the day of the accident but acknowledged that she had taken the prescription medications Klonopin, Levothyroxine, and Celexa about eight-and-a-half hours before the accident.

In her conversation with Detective Gunzenhauser, Mulally said she was unsure why her urine tested positive for amphetamines. She denied using methamphetamine on the day of the accident and explained that she was not prescribed Adderall. When Mulally stated that she was done talking, Detective Gunzenhauser terminated the interview and did not arrest her.

Subsequently, the State charged Mulally in an amended information with aggravated battery while operating a vehicle under the influence of any drug or combination of drugs to a degree that rendered her incapable of safely driving a vehicle (aggravated battery while DUI).

Immediately before trial, Mulally objected to the admission of the plastic baggie found in her bra. The district court overruled Mulally's objection.

At trial, an eyewitness to the collision, Theresa Henre, testified that she was driving westbound when she saw a Jeep travel towards her on the wrong side of the road. Henre could not see the driver's face because the driver of the Jeep was looking down. To avoid a collision, Henre swerved onto the grass beside the road and honked her horn. When Henre honked, the Jeep "just kind of swayed back over" towards its proper lane. But as Henre watched in her rearview mirror, the Jeep moved back over into the oncoming lane of traffic and collided with Smith's vehicle.

4

Smith also testified regarding the collision. According to her, Mulally crossed over into her lane, was driving with her head down, and never looked up before she collided with Smith's vehicle. Smith, who testified from a wheelchair, described her injuries from the collision. She sustained a "crushed" right ankle and a 2-inch laceration to her arm. Smith's injuries required a month-long hospitalization and five weeks in a rehabilitation facility. At the time of trial, despite four surgeries, Smith could not walk due to her injuries. An upcoming fifth surgery was scheduled to help her walk again.

Officer Lynn testified regarding his on-scene investigation. He determined that Mulally had struck Smith's vehicle because Mulally's vehicle was in Smith's lane of traffic. Without objection, the officer discussed the baggie found on Mulally. Officer Lynn testified, "In my experience as a Law Enforcement Officer, I'm aware that this particular type of Ziploc bag is usually used to hold and contain illegal narcotics."

Officer Lynn discussed his attempt to obtain a blood draw from Mulally. The officer explained that Mulally initially said she would submit to a blood test. The prosecutor asked what Mulally's response was after Officer Lynn read her the implied consent advisory. At trial, Mulally objected on Fourth Amendment grounds. The State responded that Officer Lynn had probable cause to request the blood test and "[Mulally] read her rights, and she refused to take it." The district court overruled Mulally's objection.

On cross-examination, Officer Lynn was asked to read from his accident narrative. He read that Mulally was arrested for possession of drug paraphernalia and traffic violations and then released to the care of the hospital. There was no objection to this testimony.

Detective Gunzenhauser testified regarding his investigation and discussed the medical records he received from Overland Park Regional Hospital regarding Mulally's

5

care and treatment. Without objection, the detective explained that the drug screen results from the hospital showed that Mulally tested positive for opiates, amphetamines, and benzodiazepines. According to Detective Gunzenhauser, amphetamines can remain in a person's system for about 7 to 14 days.

The State offered Detective Gunzenhauser's recorded interview of Mulally in evidence. Mulally objected, claiming the recording was inadmissible because the detective failed to advise Mulally of her *Miranda* rights before the interview. The district court ruled that the interview was not custodial and that, as a result, *Miranda* warnings were not required. The objection was overruled.

The State also sought admission of Exhibit No. 4, the document memorializing the drug screen results. Mulally objected, arguing the State lacked a foundation to admit the printout because defense counsel could not cross-examine Detective Gunzenhauser about it and admission of the printout would violate the Confrontation Clause of the Fifth Amendment to the United States Constitution. After the State suggested that Thompson could testify about the drug screen results, the district court took the matter under advisement pending her testimony.

Next, Thompson testified regarding her encounter with Mulally at the hospital. When Thompson cut off Mulally's bra, she found a very small plastic baggie. Thompson gave the baggie to Officer Lynn because she believed it looked like drug paraphernalia. The State moved to admit the baggie in evidence, Mulally renewed her objection, and then the district court admitted it.

Thompson also testified regarding Mulally's drug screen results. Without objection, she testified that Mulally's drug screen came back positive for opiates, benzodiazepines, and amphetamines. Thompson acknowledged that the doses of Dilaudid she administered to Mulally would explain the positive result for opiates. However,

6

Mulally received no drug from the hospital which could have resulted in the positive result for amphetamines. Moreover, Thompson pointed out there would be no medical reason to give Mulally amphetamines after the collision.

Regarding the positive drug screen result for benzodiazepines, Thompson described them as muscle relaxers commonly known as Klonopin and Ativan. Thompson confirmed that ingestion of Klonopin—a medication that Mulally was prescribed—would result in a positive screen for benzodiazepines. Thompson explained that a person taking Klonopin should not drive a vehicle because the medication can cause sleepiness. She further stated that it would be "very unsafe" for a person to drive having ingested both Klonopin and amphetamines into that person's system. Thompson acknowledged that Mulally's hospital records showed that another nurse administered Ativan to Mulally before the drug screen was performed.

After Thompson's testimony regarding Mulally's drug screen results, the State moved to admit Mulally's hospital records—Exhibit No. 7—which included a printout of Mulally's drug screen results. Mulally did not object to the introduction of the hospital records.

At the close of evidence, the district court addressed Exhibit No. 4—the printout of Mulally's drug screen which the State sought to introduce after Detective Gunzenhauser's testimony. The State withdrew this exhibit, noting that the same printout was included in Mulally's hospital records admitted in evidence as Exhibit No. 7. The district court ruled that Mulally could still object to the drug screen as a part of Exhibit No. 7. Mulally reprised her argument that the drug screen printout was inadmissible under the Confrontation Clause. The district court admitted the drug screen portion of Mulally's hospital records over her objection, ruling that the document was not testimonial in nature.

7

The jury found Mulally guilty of aggravated battery while DUI. Smith died after Mulally's trial. At sentencing, the State explained that "[Smith] went to the hospital to get the final surgery on her ankle, foot, to try to get it so she could walk again and she died." The district court sentenced Mulally to 122 months in prison.

Mulally appeals.

SUFFICIENCY OF EVIDENCE OF AGGRAVATED BATTERY WHILE DUI

Mulally first contends there was insufficient evidence presented at trial to support her conviction of aggravated battery while DUI. In particular, she asserts:

> "Based on the paucity of evidence presented about the quantity of drugs in [her] system, the specific identities of the drugs in [her] system, and the effect that a specific drug in a specific quantity would have had on [her], it was impossible for the jury to legally conclude that it was drugs that affected [her] driving."

When the sufficiency of evidence is challenged in a criminal case, our court reviews all evidence in the light most favorable to the State. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). The conviction will be upheld if the court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, an appellate court generally will not reweigh the evidence or reassess witness credibility. 307 Kan. at 668. Lastly, a verdict may be supported by circumstantial evidence if that evidence provides a basis for a reasonable inference by the fact-finder on the fact in issue. To be sufficient, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016).

8

Mulally was charged and convicted of aggravated battery in violation of K.S.A. 2016 Supp. 21-5413(b)(3)(A). This subsection provides that an aggravated battery includes driving under the influence "when great bodily harm to another person or disfigurement of another person results from such act." K.S.A. 2016 Supp. 21-5413(b)(3)(A). To establish that Mulally committed an aggravated battery while DUI, the State was required to prove that she was operating the vehicle "under the influence of a drug or combination of drugs to a degree that rendered her incapable of safely driving a vehicle." See K.S.A. 2016 Supp. 8-1567(a)(4).

Mulally does not contest that Smith suffered great bodily harm or disfigurement from the collision. She also admits "there was evidence of drugs in Mulally's system." Mullaly's complaint is that the "specific identities" and "precise levels of any drugs in Mulally's system" were not proven.

We are persuaded that, in the light most favorable to the State, there was sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Mulally operated a vehicle while under the influence of drugs to a degree that rendered her incapable of safely driving her vehicle. The following evidence—considered in its totality—was sufficient for the jury to render a guilty verdict:

- Moments before the collision, Henre observed Mulally looking down while driving, traveling on the wrong side of the road, and approaching her oncoming vehicle. After honking her horn and avoiding a head-on collision, Henre saw Mulally's car return to its proper lane of traffic only to see it cross over again into the oncoming lane and collide with Smith's vehicle. "Obviously, evidence of unsafe driving can suggest intoxication." *City of Wichita v. Molitor*, 301 Kan. 251, 268, 341 P.3d 1275 (2015).

9

- Immediately before the collision, Smith observed Mulally's vehicle cross over into the oncoming lane of traffic. Mulally's head was down and she never looked up before impact. Mullally's driving behavior after the near collision with Henre—returning to the proper lane of traffic but then promptly crossing over and striking Smith's oncoming vehicle—suggests that Mulally's dangerous driving was not the result of simple inattentiveness or falling asleep, but the result of being under the influence of drugs which rendered her incapable of safely driving the vehicle.

- Trial evidence showed that Mulally had Klonopin in her system at or about the time of the collision which could result in an individual being unable to safely drive a vehicle. Mulally informed Detective Gunzenhauser that she took Klonopin about eight hours prior to the collision. Thompson testified that Klonopin can cause sleepiness and a person should not drive a vehicle while taking that medication.

- There was evidence that Mullaly had amphetamines in her system at or about the time of the collision, which Thompson said could not be explained by any drug administered at the hospital. Although Detective Gunzenhauser testified that amphetamines may stay in a person's system for about 7 to 14 days, evidence suggested that Mulally recently ingested illegal drugs before the collision. Thompson found a small plastic baggie—which she suspected was drug paraphernalia—inside Mulally's bra. Based on his training and experience, Officer Lynn confirmed that the baggie, which contained residue, was typically utilized by users of illegal drugs to hold narcotics. Lastly, Thompson opined that it would be "very unsafe" to drive while taking Klonopin and amphetamines together.

Contrary to Mulally's claim, there was evidence showing the specific drugs that Mulally had ingested prior to the collision. There was also evidence as to the adverse effect these drugs would have on safe driving behavior. Moreover, Mulally does not favor us with any caselaw that requires the State to prove the quantifiable amounts of drugs a person ingested prior to the collision.

Additionally, contrary to Mulally's claims, the jury was not required to engage in improper inference stacking to find her guilty. The jury heard direct evidence of Mulally's usage of prescribed and/or illicit drugs before the collision. Evidence was presented that the use of these drugs could adversely affect a person's ability to safely operate a motor vehicle. There was also eyewitness testimony regarding Mulally's dangerous driving which caused the violent collision.

Mulally's failure to drive in the proper lane after being alerted by Henre honking her vehicle's horn, along with her positive drug results, her admission to using prescription medications known to cause drowsiness, and the suspected drug paraphernalia located in her bra, leads to a fair inference that Mulally's inattentiveness and unsafe driving was related to the effects of a drug or combination of drugs. And Mulally's inability to operate her car within the proper lane is persuasive evidence that the influence of drugs was strong enough to render her incapable of safely driving.

Having reviewed all the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found Mulally guilty beyond a reasonable doubt of aggravated battery while DUI.

ADMISSION OF PLASTIC BAGGIE INTO EVIDENCE

Mulally makes four claims of error regarding the district court's admission of the small plastic baggie into evidence. First, Mulally argues the baggie should not have been

11

admitted because it was not relevant to a material issue at trial. Second, even if the baggie was relevant, its admission was unduly prejudicial. Third, Mulally asserts the baggie was improperly admitted as K.S.A. 60-455 prior crimes evidence. Fourth, despite this error, the district court should have submitted a K.S.A. 60-455 limiting jury instruction.

Our court employs a two-step process to review a district court's decision to admit evidence. *State v. Lowery*, 308 Kan. 1183, 1226, 427 P.3d 865 (2018). First, we determine whether the challenged evidence is relevant. If so, we review the district court's application of the statutory provisions and legal principles governing evidence. 308 Kan. at 1226. "Appellate review of the trial court's application of the applicable legal rules and principles depends upon whether the rule or principle permits the trial court to exercise its discretion (abuse of discretion review) or whether the rule raises questions of law (unlimited review)." *State v. Miller*, 308 Kan. 1119, 1166, 427 P.3d 907 (2018).

*Relevance of the Plastic Baggie*

Mulally claims the "baggie was not relevant because it had no tendency in reason to prove any material fact." She asserts the plastic baggie does not indicate she was under the influence of drugs when the accident occurred because the State produced no evidence that drugs were in the baggie.

To be relevant, evidence must be both material and probative. *Lowery*, 308 Kan. at 1226. Evidence is material when the fact it supports is in dispute and has a legitimate bearing on the outcome of the case. 308 Kan. at 1226. "Evidence is probative if it has any tendency to prove any material fact." *Miller*, 308 Kan. at 1167. The district court's ruling on materiality is reviewed de novo, but probativity is reviewed for abuse of discretion. *Lowery*, 308 Kan. at 1226. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the judge; (2) it is based on an error of

law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

Here, the district court ruled that the plastic baggie "provide[s] a relevant link in the chain of evidence leading to this DUI related aggravated battery offense." The district court found the baggie was probative, noting that it could explain why Mulally had amphetamine in her system and a jury could see the empty baggie as evidence that Mulally had recently used the drug before the collision.

Whether Mulally was under the influence of drugs at the time of the collision was a material issue in the case. See K.S.A. 2016 Supp. 21-5413(b)(3)(A); K.S.A. 2016 Supp. 8-1567(a)(4). As the district court determined, the empty plastic baggie found inside Mulally's bra tended to prove that she ingested drugs before the collision. Officer Lynn and Thompson recognized the baggie as drug paraphernalia, and Officer Lynn testified that the baggie was a type commonly used to contain illegal narcotics.

Although the State presented no direct evidence that drugs had been in the plastic baggie, its possession (and the fact it was secreted in Mulally's undergarment) made it more probable that Mulally had recently used illegal narcotics than it would be without the evidence. The baggie also made it more likely that Mulally's positive drug screen for amphetamines was the result of illegal drug usage before the accident, rather than drugs administered at the hospital or a false positive on her drug screen.

A reasonable person could find that the plastic baggie tended to prove that Mulally was under the influence of drugs at the time of the collision. Since Mulally's drug use was a material fact in the case, the district court did not err by finding that the baggie was relevant evidence.

*More Probative than Prejudicial*

Mulally also argues that if the plastic baggie was relevant, the district court abused its discretion by refusing to find the prejudicial effect of the baggie greatly outweighed any probative value. Mulally asserts the admission of the baggie was unduly prejudicial because it suggested that she was a criminal and user of illegal drugs.

A district court has discretion to exclude relevant evidence when it finds its probative value is outweighed by the potential for producing undue prejudice. K.S.A. 60-445. See *State v. Boysaw*, 309 Kan. 526, 540, 439 P.3d 909 (2019). In this case, the district court concluded that the plastic baggie's probative value was not outweighed by the potential for undue prejudice. Our court reviews the district court's determination that the probative value of evidence outweighs its potential for producing undue prejudice for an abuse of discretion. *Ingham*, 308 Kan. at 1469. "No set test exists for weighing probative value against prejudicial effect." *Boysaw*, 309 Kan. at 541. However, "the exclusion of relevant evidence is an extraordinary remedy that should be used sparingly." *State v. Seacat*, 303 Kan. 622, 640, 366 P.3d 208 (2016).

As previously discussed, the small plastic baggie was probative of whether Mulally was under the influence of drugs at the time of the collision. The closing arguments show that this material fact was the primary issue in the case. Mulally argued the drugs causing the positive result for amphetamines could have been ingested seven to 14 days before the collision and the positive result did not show she was impaired. Mulally then proposed that a medical condition may have caused her unsafe driving. The empty baggie concealed in Mulally's bra, however, was probative of her recent use of illegal narcotics, consistent with her impairment at the time of the collision.

In comparison to its probative value, there was little risk of undue prejudice. Undue prejudice does not turn on "whether the evidence is damaging but on whether the

14

evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial." *State v. Dern*, 303 Kan. 384, 395, 362 P.3d 566 (2015). The admission of the plastic baggie was unlikely to contribute to an improper jury verdict. While Mulally complains that the baggie insinuated she was an illegal drug user, her recent drug use before the collision was a central issue at trial and an element of the crime that the State was required to prove. And the baggie only suggested that Mulally used illegal drugs near the time of the collision, not that she had a history of drug use unrelated to the collision.

In sum, the small plastic baggie was probative to a material fact and likely did not distract the jury from the central issues in the case. Moreover, the district court did not abuse its discretion by ruling the evidence's probative value was not outweighed by undue prejudice.

*Admissibility of the Plastic Baggie Under K.S.A. 60-455*

Next, Mulally contends the district court erred by admitting the plastic baggie in evidence because the State failed to give the required statutory notice that it intended to offer evidence of prior crimes, and the district court failed to consider the admissibility of the baggie under K.S.A. 60-455. Mulally also claims the district court erred by failing to give a K.S.A. 60-455 limiting instruction regarding the baggie.

Generally, all relevant evidence is admissible unless prohibited by statute, constitutional provision, or court decision. See K.S.A. 60-407(f); *Nauheim v. City of Topeka*, 309 Kan. 145, 153, 432 P.3d 647 (2019). Under K.S.A. 2019 Supp. 60-455(a), evidence of a person's prior crimes or civil wrongs may not be admitted to prove that the person has the tendency to commit certain crimes. But the statute also provides that evidence of prior crimes or civil wrongs is admissible if it proves a material fact other than the propensity to commit crimes, such as motive or intent. K.S.A. 2019 Supp. 60-455(b). If the State intends to offer K.S.A. 60-455 evidence, the prosecuting attorney

15

must disclose the evidence to the defendant "at least 10 days before the scheduled date of trial or at such later time as the court may allow for good cause." K.S.A. 2019 Supp. 60-455(e).

While on appeal Mulally claims the plastic baggie was evidence of another crime used to establish an improper propensity inference, she did not object on that basis at trial. Instead, Mulally objected because the prejudicial effect of the baggie outweighed any probative value. Importantly, Mulally never argued that the admission of the baggie violated either K.S.A. 2019 Supp. 60-455(a) or (e).

Under K.S.A. 60-404, a defendant must make a timely and specific objection to the admission of evidence at trial to preserve the issue for appeal. Additionally, a party may not object at trial to the admission of evidence on one ground and then argue a different ground on appeal. See *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). "The contemporaneous objection rule applies to evidence alleged to be admitted in violation of K.S.A. 60-455." *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012); also see *State v. Yaeger*, No. 112,692, 2015 WL 6835257, at *1-2 (Kan. App. 2015) (unpublished opinion) (requiring a contemporaneous objection to preserve an argument that the prosecuting attorney failed to timely disclose K.S.A. 60-455 evidence).

Since Mulally failed to make an objection under K.S.A. 60-455 at trial, she failed to preserve the admissibility issue for appellate review.

*Failure to Give a K.S.A. 60-455 Limiting Instruction*

In addition to erroneously admitting K.S.A. 60-455 evidence, Mulally contends the district court erred by failing to give a limiting instruction regarding the plastic baggie.

16

At the outset, Mulally's instructional argument is not waived by her failure to object to the alleged K.S.A. 60-455 evidence at trial. *State v. Breeden*, 297 Kan. 567, 582-83, 304 P.3d 660 (2013) ("[T]he right to challenge the lack of a [K.S.A. 60-455] limiting instruction is not based on whether a party has objected to the admission of the evidence that is the subject of the instruction."). As a result, a defendant may challenge the lack of a limiting instruction as clearly erroneous even if the defendant did not object to the admission of the prior crimes evidence at trial. 297 Kan. at 583.

When reviewing jury instruction issues, our court determines (1) whether the issue was preserved for appellate review; (2) whether the instruction was legally and factually appropriate; and (3) whether any error was harmless. *State v. Barrett*, 309 Kan. 1029, 1036-37, 442 P.3d 492 (2019). Whether a party preserved the jury instruction issue affects the reversibility inquiry at the third step. *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018). Since Mulally did not request a K.S.A. 60-455 limiting instruction, we evaluate her claim under the clearly erroneous standard. K.S.A. 2019 Supp. 22-3414(3). An instruction is clearly erroneous only if the defendant firmly convinces the appellate court that the jury would have returned a different verdict if the instruction had been given. *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016).

Turning to whether the instruction was appropriate, our Supreme Court has noted that a limiting instruction is not legally proper when the evidence of prior bad acts or crimes is not subject to K.S.A. 60-455. *State v. Gonzalez*, 307 Kan. 575, 597, 412 P.3d 968 (2018).

When evidence of prior bad acts or crimes is admitted at trial under K.S.A. 60-455, our Supreme Court requires the district court to give a limiting instruction informing the jury of the specific purpose for its admission. *State v. Gunby*, 282 Kan. 39, 48, 144 P.3d 647 (2006). But K.S.A. 60-455 does not apply when the evidence at issue relates to crimes or civil wrongs committed concurrently with the events surrounding the crimes for

17

which the defendant is on trial. *State v. King*, 297 Kan. 955, 963-64, 305 P.3d 641 (2013). Applying *King*, our Supreme Court has found that "K.S.A. 60-455 does not prohibit the admission of evidence regarding other crimes and civil wrongs if the evidence relates to acts *committed as part of the events surrounding the crimes* or civil wrongs at issue in the trial." (Emphasis added.) *State v. Charles*, 304 Kan. 158, 175-76, 372 P.3d 1109 (2016), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017).

In this case, the plastic baggie was found on Mulally after the collision for which she was on trial. The baggie was admitted to show that Mulally was under the influence of drugs when the collision occurred. While the baggie was evidence of the crime of possessing drug paraphernalia, this crime was committed concurrent with the events surrounding the aggravated battery while DUI for which Mulally was on trial. Under *King*, K.S.A. 60-455 does not apply to Mulally's contemporaneous possession of the baggie as drug paraphernalia. As a result, a limiting instruction was not legally or factually appropriate, and the district court did not err by failing to give the instruction.

ADMISSION OF INTERVIEW RECORDING INTO EVIDENCE

Mulally contends the district court erred by admitting into evidence the recording of her interview with Detective Gunzenhauser. Mulally argues her statements to Detective Gunzenhauser were not admissible because she was subjected to a custodial interrogation and was not read her *Miranda* rights before making incriminating statements. In support of this assertion, Mulally claims that Detective Gunzenhauser's interview was custodial because she was arrested by Officer Lynn on the day of the accident.

When the State requested admission of the recording of Mulally's interview with Detective Gunzenhauser, she objected and argued the recording was inadmissible because Detective Gunzenhauser failed to advise her of *Miranda* rights before the

18

interview. After the State engaged in a brief inquiry with the detective regarding the nature of the interview, the district judge ruled that it "was not a custodial interrogation and *Miranda* does not apply, and over defense objection, I will admit [the recording] and allow it to be published into evidence." In short, this issue was preserved for appellate review. See *State v. Ballou*, 310 Kan. 591, 613-14, 448 P.3d 479 (2019) (noting a timely objection comes between the introduction of the evidence and its admission).

Statements made during a custodial interrogation must be excluded under the Fifth Amendment to the United States Constitution unless the State demonstrates it used procedural safeguards—*Miranda* warnings—to secure the defendant's privilege against self-incrimination. *State v. Regelman*, 309 Kan. 52, 59, 430 P.3d 946 (2018). But the *Miranda* safeguards are triggered only when the accused is in custody and subject to interrogation. 309 Kan. at 59.

"A custodial interrogation is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom in any significant way." *State v. Lewis*, 299 Kan. 828, 834, 326 P.3d 387 (2014). A custodial interrogation differs from an investigatory interrogation, which occurs as a routine part of the fact-finding process before an investigation reaches the accusatory stage. *Regelman*, 309 Kan. at 59.

The United States Supreme Court in *Miranda* emphasized that these constitutional protections applied only to custodial interrogations, not to "general on-the-scene police questioning of a suspect in the fact-finding process." *State v. Vanek*, 39 Kan. App. 2d 529, 532, 180 P.3d 1087 (2008). In particular, the Supreme Court noted:

> "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected

19

by our holding. . . . In such situations, the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present. [Citations omitted.]" *Miranda*, 384 U.S. at 477-78.

In making the determination of whether questioning is investigatory or custodial, an objective standard is used. *State v. Jacques*, 270 Kan. 173, 186, 14 P.3d 409 (2000). "The proper analysis is how a reasonable person in the suspect's position would have understood the situation." 270 Kan. 173, Syl. ¶ 6.

The Kansas Supreme Court has identified eight factors for courts to consider in determining whether police questioning of an individual is investigative or custodial. These factors include:

"(1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation." *Regelman*, 309 Kan. at 59.

When considering these eight factors, no single factor outweighs another, and the factors are not treated as if each one bears equal weight. Each case must be analyzed on its own particular facts. 309 Kan. at 59. We will analyze each factor separately.

The material facts related to Detective Gunzenhauser's interview of Mulally are not in dispute. Accordingly, our court uses a de novo standard of review to determine whether, under the totality of the circumstances, a reasonable person in Mulally's position

would have felt free to terminate the interrogation and disengage from the encounter. See 309 Kan. at 60.

*The Time and Place of the Interrogation*

"Generally, other things being equal, a person questioned in familiar, or at least neutral, surroundings does not face the same pressures as one questioned in a police-dominated atmosphere and this factor weighs against a conclusion that an interview was custodial." *State v. Warrior*, 294 Kan. 484, 497, 277 P.3d 1111 (2012). In *Warrior*, the Kansas Supreme Court found that police interviews which occurred in the defendant's hospital room were investigatory, not custodial in nature. 294 Kan. at 497-503. In reaching this conclusion, the court noted that "'a hospital room does not produce the aura of police authority that a police department interview room does.'" 294 Kan. at 497-98 (quoting *People v. Vasquez*, 393 Ill. App. 3d 185, 191, 913 N.E.2d 60 [2009]).

Like the location in *Warrior*, the interview here occurred in a hospital room, and it took place at a reasonable time—at 10:18 in the morning. Given that the interview was done at a neutral location and at a reasonable time, this factor weighs in favor of a finding that Mulally was not in custody.

*Duration of the Interview*

Detective Gunzenhauser's interview lasted only about eight minutes. Before questioning, the detective informed Mulally that she could stop the interview at any time, which she did shortly after it began.

*The Number of Law Enforcement Officers Present*

Detective Gunzenhauser was the only officer present during the interview.

*The Conduct of the Officer and the Person Questioned*

Detective Gunzenhauser began the interview by telling Mulally that he was not going to take her to jail regardless of what was discussed during the interview. He also told her that she could terminate the interview at any time. Mulally responded that she would cooperate to the best of her ability, but that she was not going to incriminate herself and knew "enough about the law [to know] when to shut up."

During the interview, Detective Gunzenhauser did not use coercive threats or hostile language. After he began asking Mulally why she tested positive for amphetamines and whether she used methamphetamine, Mulally stated that she was done answering questions and terminated the interview.

*Actual Physical Restraint or Its Functional Equivalent*

Mulally was unable to leave the hospital due to her injuries at the time of the interview. However, "physical incapacity resulting from forces outside the control of law enforcement does not amount to custody." *Warrior*, 294 Kan. at 498. As a result, "a law enforcement interview of an accident victim at a hospital is not a custodial interrogation unless the victim's confinement is instigated by law enforcement or controlled for custodial purposes." 294 Kan. at 498.

Mulally argues that she was in custody at the hospital because Officer Lynn arrested her for possession of drug paraphernalia on the day of the collision. While Officer Lynn arrested Mulally for possessing drug paraphernalia on February 1, 2017, he promptly released her from custody so that she could be taken to the hospital for treatment. During her hospitalization, Mulally was not restrained by law enforcement officers, nor was there any evidence that officers exercised any care, custody, or control over her. As a result, Officer Lynn's prior arrest and release from custody does not show

22

that Mulally was in custody when Detective Gunzenhauser interviewed her one week later about a different criminal offense. See *People v. Goff*, No. C043862, 2004 WL 2011459, at *5 (Cal. App. 2004) (unpublished opinion).

*Whether the Person Is Being Questioned as a Suspect or a Witness*

Before Detective Gunzenhauser interviewed Mulally, he was aware of the small plastic baggie found on Mulally. The detective also received the drug screen results which were positive for opiates, amphetamines, and benzodiazepines. Given Detective Gunzenhauser's questions regarding her use of methamphetamine on the day of the collision and Mulally's prompt termination of the interview, it is apparent that she understood she was being interviewed as a suspect. "But the fact a suspect is the focus of an investigation, standing alone, does not trigger the need for *Miranda* warnings." *Warrior*, 294 Kan. at 503.

*How the Person Arrived at the Location of the Interview*

About one week prior to the interview, Mulally was transported by ambulance to the hospital for treatment, not by order of law enforcement.

*The Result of the Interrogation*

As promised by Detective Gunzenhauser, Mulally was not arrested or detained after the interview. The interview took place on February 8, 2017, and Mulally was not charged with aggravated battery while DUI until February 27, 2017.

*Conclusion*

The totality of the circumstances shows that a reasonable person in Mulally's position would have felt free to terminate the interview and disengage from the

23

encounter. Indeed, that is exactly what Mulally did. Given that Detective Gunzenhauser told Mulally she could stop the questioning at any point, the short duration of the interview, the neutral location of where the interview took place, the lack of any restraints, the detective's nonaccusatory interview style, and that he was the only officer to conduct the interview, we are persuaded Mulally was not deprived of her freedom in any significant way. Additionally, Detective Gunzenhauser's assurance that Mulally would not be taken to jail following the interview conveyed he was still in the fact-finding process.

Considering together the eight factors listed in *Regelman*, we are persuaded that Detective Gunzenhauser engaged in investigative questioning of Mulally and she was not in custody at the time of the interview. As a result, Detective Gunzenhauser was not required to advise Mulally of her *Miranda* rights and obtain a waiver of those rights prior to questioning. The district court did not err by overruling Mulally's objection and admitting the recording of her interview into evidence.

ADMISSION OF DRUG SCREEN PRINTOUT INTO EVIDENCE

Mulally claims the district court erred by admitting the results of her drug screen printout into evidence. She asserts the drug screen results recorded on the printout were inadmissible because: (1) the results were irrelevant; (2) the State failed to establish a foundation for the admission of scientific evidence; (3) the State failed to establish a chain of custody; and (4) the prejudicial effect of the results outweighed any probative value.

At trial, Mulally objected to the drug screen printout and argued that its admission violated her rights under the Fifth Amendment's Confrontation Clause. The district court overruled Mulally's objection, finding the drug screen results memorialized on the printout were not testimonial. Since Mulally does not reprise her Confrontation Clause

argument on appeal, she has abandoned that issue. See *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (noting that an issue not briefed is deemed waived or abandoned).

Importantly, Mulally did not object to the drug screen printout at trial based on the four reasons she raises for the first time on appeal. As a result, Mulally failed to preserve these arguments for appellate review. See *McCormick*, 305 Kan. at 47 (A party may not object at trial to the admission of evidence on one ground and then on appeal argue a different ground.).

Moreover, assuming Mulally preserved her arguments for appellate review and one of them was meritorious, any error in admitting the drug screen printout would be harmless. "Assuming error and assuming that it is of a constitutional dimension, this court may find the error harmless so long as there was no reasonable possibility that it affected the outcome of the trial." *Ingham*, 308 Kan. at 1472.

In the case on appeal, Detective Gunzenhauser and Thompson testified extensively about Mulally's drug screen results and, without objection from Mulally, explained that her drug screen was positive for opiates, benzodiazepines, and amphetamines. As a result, any error in admitting the drug screen printout was harmless because the same evidence was admitted through witness testimony without objection. See *Lowery*, 308 Kan. at 1235-36 (finding error harmless when evidence contained in potentially inadmissible hearsay came in through other testimony without objection).

The district court did not err in admitting the drug screen printout into evidence.

ADMISSION OF REFUSAL TO CONSENT TO A BLOOD DRAW

Mulally contends the State violated her constitutional rights by admitting evidence that she refused a blood draw. Relying on *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240,

25

49 L. Ed. 2d 91 (1976), Mulally argues that the State committed reversible error by calling attention to her refusal of the blood draw and using that refusal as evidence of her guilt.

Appellate review of whether a defendant's constitutional rights were violated by the State's introduction of evidence is a question of law subject to unlimited review. *State v. Fisher*, 304 Kan. 242, 248, 373 P.3d 781 (2016). Both parties frame this issue solely as an evidentiary claim. Evidentiary claims—including claims related to the State's questioning of a witness—must be preserved for appellate review by a contemporaneous objection. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009).

At trial, Officer Lynn testified that he wanted to obtain a blood draw from Mulally. Officer Lynn explained that "I originally asked her if she would submit to a blood draw and initially she said that she would." But before a blood draw was taken, Officer Lynn read Mulally an implied consent advisory. The implied consent advisory stated, in relevant part, that Kansas law required Mulally to complete a breath, blood, or urine test to determine if she was under the influence of alcohol and/or drugs. The advisory also informed Mulally that her refusal to submit to testing may be used against her at any trial arising out of the operation of a vehicle while under the influence of alcohol/drugs.

After Officer Lynn testified that Mulally initially agreed to complete a blood draw, the prosecutor asked, "And after you had read her the implied consent, what was her response?" Before Officer Lynn could answer, Mulally's attorney objected to the question under Fourth Amendment grounds and cited *State v. Ryce*, 303 Kan. 899, 368 P.3d 342 (2016) (*Ryce I*), *aff'd on reh'g* 306 Kan. 682, 396 P.3d 711 (2017) (*Ryce II*). The State responded that Officer Lynn had probable cause to request a blood test and explained—apparently within the jury's hearing—that Mulally refused to complete the blood draw. The district court overruled Mulally's objection to the State's questioning. However, the

26

State then changed subjects and Officer Lynn never actually testified that Mulally refused the blood draw.

While no testimony was presented that Mulally refused the blood draw, both parties treat the State's recitation of this fact in its argument as admitted evidence. Accordingly, we will consider Mulally's refusal to consent to a blood draw as evidence admitted over her timely objection.

During closing argument, the State relied on Mulally's refusal to consent to a blood draw and argued it suggested she was under the influence of drugs:

> "He goes on and on about testing. Well, guess what? The State of Kansas wanted to test her. They read her all of her rights. The Officer said she followed along. Initially she said she would take the test, and then when it got to will you take it? No.
>     ". . . She could have got her own test. But guess what? She said no, no, no. Because why? Because there's only one reason this crash happened. And it's because she was under the influence."

On appeal, Mulally does not favor us with on-point legal authority in support of her contention. However, she mentions our Supreme Court's decision in *Ryce I* to support her argument that the State violated her Fourth Amendment rights when it presented testimony that she refused to submit to a warrantless blood test.

Mulally's argument presents an issue similar to one our court addressed in *State v. Arellano*, No. 116,448, 2018 WL 1352571 (Kan. App. 2018) (unpublished opinion). In *Arellano*, this court determined that the admission of a defendant's refusal to take a breath-alcohol test did not violate the defendant's rights under the Fourth Amendment. 2018 WL 1352571, at *3-4. Like the admitted breath test in *Arellano*, we are persuaded that the State's evidence that Mulally refused to consent to a blood draw did not violate her Fourth Amendment rights. See *State v. Rajda*, 208 Vt. 324, 332-44, 196 A.3d 1108

27

(2018) (providing an extensive analysis on why the Fourth Amendment does not bar admission of a defendant's refusal to submit to a warrantless blood draw).

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights protects citizens from unreasonable searches and seizures. All warrantless searches are per se unconstitutional, subject only to a few specific and well-established exceptions. *State v. Estrada-Vital*, 302 Kan. 549, 556, 356 P.3d 1058 (2015). "The exceptions to the warrant requirement are: '"consent; search incident to a lawful arrest; stop and frisk; probable cause plus exigent circumstances; the emergency doctrine; inventory searches; plain view or feel; and administrative searches of closely regulated businesses."'" 302 Kan. at 556 (quoting *State v. Sanchez-Loredo*, 294 Kan. 50, 55, 272 P.3d 34 [2012]).

A blood draw conducted by police constitutes a search under the Fourth Amendment. *Ryce I*, 303 Kan. at 910. In this case, Mulally did not submit to a blood draw following the collision so there was no warrantless search. Instead, her argument focuses on the theory that by using evidence of her refusal at trial, the State punished her for exercising her Fourth Amendment right to refuse to consent to a warrantless search. In this respect, Mulally likens the State's use of her refusal to a *Doyle* violation—a Fifth Amendment issue—which occurs when the State seeks to impeach a defendant with his or her post-*Miranda* silence. See *Fisher*, 304 Kan. at 248.

At the time Mulally refused the blood draw, the Kansas implied consent law allowed an individual's refusal of a blood test to be admissible as evidence against that individual. K.S.A. 2016 Supp. 8-1001(n). Even after subsequent revisions, Kansas law currently provides that a person's refusal to submit to a blood draw "shall be admissible in evidence against the person at any trial on a charge arising out of the alleged operation or attempted operation of a vehicle while under the influence of alcohol or drugs, or both." K.S.A. 2019 Supp. 8-1001(n). Importantly, our Supreme Court has upheld the

28

constitutionality of a former version of this provision and allowed refusal evidence to be admitted at trial. *State v. Compton*, 233 Kan. 690, 694, 664 P.2d 1370 (1983).

Contrary to Mulally's argument, *Ryce I* does not support her claim that the State's proof of her refusal to consent to a blood test violated her constitutional rights. In *Ryce I*, our Supreme Court held that K.S.A. 2014 Supp. 8-1025—which imposed criminal penalties on an individual who refused to submit to any test that is deemed consented to—was facially unconstitutional because it criminalized an individual's right to withdraw consent to a warrantless search. 303 Kan. at 963. Using a due process analysis, the Supreme Court agreed that the State had a compelling interest to prevent drunk driving, but ultimately held that K.S.A. 2014 Supp. 8-1025 was not narrowly tailored to serve those compelling interests. 303 Kan. at 963. In this analysis, the court noted that other constitutional penalties—such as suspension of driving privileges—encouraged suspects to provide consent to testing. 303 Kan. at 958-63. Nothing in *Ryce I* suggests it overruled *Compton* or otherwise forbade prosecutors from offering evidence of a test refusal against a defendant.

In addition to our Supreme Court, the United States Supreme Court has upheld similar laws and approved using refusal evidence as evidence of guilt at a criminal trial. The United States Supreme Court in *South Dakota v. Neville*, 459 U.S. 553, 554, 564, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983), held that admitting evidence of a defendant's refusal to submit to a blood-alcohol test does not offend the Fifth Amendment right against self-incrimination. In so holding, the *Neville* Court distinguished its ruling in *Doyle*, where it held the Due Process Clause forbids the State from using a defendant's post-*Miranda* silence to impeach the defendant's testimony at trial. *Neville*, 459 U.S. at 564-66.

First, the Court reasoned that the right to silence post-*Miranda* warnings "is one of constitutional dimension, and thus cannot be unduly burdened," whereas the right to

refuse the blood-alcohol test "is simply a matter of grace bestowed by the South Dakota legislature." 459 U.S. at 565. The Court then noted that, unlike the *Miranda* warnings' explicit assurance that a suspect's silence will not be used against the suspect, the implied consent warnings contain no such assurances and suspects are told that repercussions will result from a refusal. 459 U.S. at 565-66.

More recently, the United States Supreme Court has expressed approval of implied consent laws because they secure consensual testing, in part, by allowing refusals to be used against defendants in criminal prosecutions. In *Missouri v. McNeely*, 569 U.S. 141, 156, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013), the Court held that whether exigent circumstances existed so as to preclude the necessity of obtaining a warrant for a nonconsensual blood test should be decided on a case-by-case basis after considering the totality of the circumstances. In its reasoning, the Court pointed out that states have legal tools to secure consensual blood-alcohol concentration (BAC) testing, including using evidence of a refusal at trial:

> "States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws. For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense. Such laws impose significant consequences when a motorist withdraws consent; typically the motorist's driver's license is immediately suspended or revoked, and most States allow the motorist's refusal to take a BAC test to be used as evidence against him in a subsequent criminal prosecution. [Citations omitted.]" 569 U.S. at 160-61.

Next, in *Birchfield v. North Dakota*, 579 U.S. \_\_\_, 136 S. Ct. 2160, 2184-85, 195 L. Ed. 2d 560 (2016), the United States Supreme Court held that the Fourth Amendment permits warrantless breath tests incident to arrests for drunk driving, but not warrantless blood tests. Relevant to this appeal, the Court also confirmed that *McNeely* and *Neville*

30

approved "the general concept of implied-consent laws that impose civil penalties and *evidentiary consequences* on motorists who refuse to comply." (Emphasis added.) 136 S. Ct. at 2185. The *Birchfield* Court noted that its decision cast no doubt on the constitutionality of such laws. 136 S. Ct. at 2185. Relying on this language in *Birchfield*, several state courts have held that the Fourth Amendment does not bar admission of a defendant's refusal to submit to a warrantless blood draw. See *Rajda*, 208 Vt. 338-40 (listing cases).

Based on this precedent from the United States Supreme Court and our Supreme Court, we hold the State did not violate Mulally's constitutional rights by offering evidence that she refused to consent to a blood draw at trial. The district court did not err by overruling Mulally's objection and allowing evidence of her refusal to be considered by the jury.

AGGRAVATED BATTERY WHILE DUI JURY INSTRUCTION

Next, Mulally contends the district court committed clear error by failing to instruct the jury on a culpable mental state required to prove she committed aggravated battery while DUI.

Once again, when reviewing jury instruction issues, our court determines (1) whether the issue was preserved for appellate review; (2) whether the instruction was legally and factually appropriate; and (3) whether any error was harmless. *Barrett*, 309 Kan. at 1036-37. Since Mulally failed to object at trial to a lack of a mental state in the aggravated battery while DUI instruction, our court evaluates her claim under the clearly erroneous standard. K.S.A. 2019 Supp. 22-3414(3). An instruction is clearly erroneous only if the defendant firmly convinces the appellate court that the jury would have returned a different verdict if the instruction had been given. *Solis*, 305 Kan. at 65.

31

In this case, the district court instructed the jury that Mulally was charged with aggravated battery while DUI, which required the State to prove: "The defendant drove under the influence and great bodily harm to or disfigurement of Carla Smith resulted from that act." The jury instructions also provided that the State needed to prove the following to establish that Mulally drove under the influence: (1) "The defendant operated a vehicle" and (2) "The defendant, while operating, was under the influence of a drug or combination of drugs to a degree that rendered her incapable of safely driving a vehicle."

Was the aggravated battery while DUI instruction clearly erroneous because it omitted the essential element of a culpable mental state required for an aggravated battery while DUI conviction?

A district court has a duty to "'inform the jury of every essential element of the crime that is charged.'" *State v. Butler*, 307 Kan. 831, 847, 416 P.3d 116 (2018) (quoting *State v. Richardson*, 290 Kan. 176, 181, 224 P.3d 553 [2010]). This duty stems from a defendant's right to a public trial guaranteed by the state and federal Constitutions. 307 Kan. at 847. Our court examines jury instructions as a whole, without focusing on any single instruction, to determine whether they fairly state the applicable law or reasonably misled the jury. *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019).

At the outset, the aggravated battery while DUI instruction provided to the jury in this case mirrors the language contained in the Pattern Instructions for Kansas (PIK). The pattern instruction for an aggravated battery while DUI provides that the State must prove: "The defendant drove under the influence and (great bodily harm to) (disfigurement of) *insert name* resulted from that act." PIK Crim. 4th 54.310 (2016 Supp.). Our Supreme Court strongly recommends using the PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions. *Butler*, 307 Kan. at 847.

32

K.S.A. 2016 Supp. 21-5202(b) provides that the relative degrees of culpable mental states are classified as intentionally, knowingly, and recklessly. Unless otherwise provided, a culpable mental state is an essential element of every crime defined by the Kansas Criminal Code. K.S.A. 2016 Supp. 21-5202(a). "If the definition of a crime does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element." K.S.A. 2016 Supp. 21-5202(d).

That said, K.S.A. 2016 Supp. 21-5203 lists crimes which do not require any culpable mental state. One of these crimes is driving under the influence under K.S.A. 8-1567. K.S.A. 2016 Supp. 21-5203(c). The statute also provides that a felony does not require a culpable mental state when the "statute defining the crime clearly indicates a legislative purpose to impose absolute liability for the conduct described." K.S.A. 2016 Supp. 21-5203(b).

Mulally was charged with aggravated battery while DUI in violation of K.S.A. 2016 Supp. 21-5413(b)(3)(A), which forbids "committing an act described in K.S.A. 8-1567, and amendments thereto, when great bodily harm to another person or disfigurement of another person results from such act." The statute referred to in this subsection—K.S.A. 8-1567—is the statute outlawing driving under the influence, which includes operating any vehicle while "under the influence of any drug or combination of drugs to a degree that renders the person incapable of safely driving a vehicle." K.S.A. 2016 Supp. 8-1567(a)(4).

We next must consider whether aggravated battery while DUI in violation of K.S.A. 2016 Supp. 21-5413(b)(3)(A) is a strict liability offense which requires no culpable mental state.

33

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *State v. LaPointe*, 309 Kan. 299, 314, 434 P.3d 850 (2019). An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. See *State v. Ayers*, 309 Kan. 162, 163-64, 432 P.3d 663 (2019).

Although aggravated battery while DUI is not specifically listed as a crime with no mental culpability under K.S.A. 2016 Supp. 21-5203, the statute provides that a person may be guilty of a crime without a culpable mental state if the statute defining the crime clearly indicates a legislative purpose to impose strict liability. K.S.A. 2016 Supp. 21-5203(b).

Liability for aggravated battery while DUI is predicated on two showings: (1) the defendant was DUI in violation of K.S.A. 2016 Supp. 8-1567, a strict liability offense, and (2) the result is that another person suffered great bodily harm or disfigurement. K.S.A. 2016 Supp. 21-5413(b)(3)(A). The language of K.S.A. 2016 Supp. 21-5413(b)(3)(A) shows that aggravated battery while DUI is an extension of DUI designed to impose additional punishment for causing great bodily harm or disfigurement to another. By predicating liability on the commission of a strict liability offense, the Legislature indicated a desire to also impose absolute liability for the crime of aggravated battery while DUI. See *State v. Kelly*, No. 114,563, 2017 WL 1295354, at *12-13 (Kan. App.) (unpublished opinion) (finding that involuntary manslaughter while DUI is a strict liability offense for the same reason), *rev. denied* 306 Kan. 1325 (2017).

Our interpretation is further supported by the language of the DUI statute, which treats aggravated battery while DUI as a subspecies of the strict liability crime. Under K.S.A. 2016 Supp. 8-1567(i)(2), a conviction for aggravated battery while DUI is used to determine whether a person's DUI conviction is a first, second, third, fourth, or subsequent conviction for sentencing purposes.

Since the language of K.S.A. 2016 Supp. 21-5413(b)(3)(A) reveals that aggravated battery while DUI is an absolute liability offense, a culpable mental state is not an essential element of the crime. Accordingly, the district court did not commit clear error by omitting a culpable mental state when instructing the jury on aggravated battery while DUI.

On a related issue, Mulally reframes her argument and contends her due process rights were violated because the jury convicted her of aggravated battery while DUI without finding every essential element of the crime. Mulally claims the jury could not have found the essential element that she possessed the requisite culpable mental state to support her aggravated battery while DUI conviction because the jury was never instructed on any mental state.

The Fifth and Sixth Amendments to the United States Constitution "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 509-10, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995). Whether a defendant's due process rights were violated is a question of law subject to unlimited review. *State v. Hayes*, 307 Kan. 537, 538, 411 P.3d 1225 (2018).

As we have determined earlier, aggravated battery while DUI is an absolute liability offense and a culpable mental state is not an essential element of the crime. As a result, the jury was not required to find beyond a reasonable doubt that Mulally possessed a culpable mental state. Accordingly, Mulally's due process rights were not violated.

CUMULATIVE ERROR

Finally, Mulally contends that her conviction should be reversed because the cumulative effect of the trial errors denied her a fair trial.

When evaluating cumulative error, the test is whether the totality of the circumstances establish that the defendant was substantially prejudiced by all the trial errors and was denied a fair trial. In assessing the cumulative effect of trial errors, the appellate court examines the errors in the context of the entire record, considering how the district court dealt with the errors as they arose; the nature and number of errors and their relationship, if any; and the overall strength of the evidence. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014).

Without any error, however, there are no errors to contribute to a cumulative error analysis and there is no basis for reversal. *State v. Barlett*, 308 Kan. 78, 91, 418 P.3d 1253 (2018).

Affirmed.